IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| DAVID WAYNE MADDOX and DAWG BONE, INC., | ) ) ) | C/A No.3:05-32-CMC |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | **OPINION AND ORDER** |
| TOSCO MARKETING COMPANY, a division of TOSCO CORPORATION Nevada Corporation and CONOCOPHILLIPS COMPANY, | ) ) ) ) ) | **GRANTING MOTION FOR SUMMARY JUDGMENT AND DISMISSING INDIVIDUAL PLAINTIFF BY CONSENT** |
| Defendants. | ) ) ) | |

This matter is before the court on Defendants' motion for summary judgment.[1]  For the reasons set forth below, the motion for summary judgment is granted in full.  In addressing this motion the court has not considered Defendants' proffer of expert witness testimony.  The grant of summary judgment, therefore, renders moot Plaintiffs' motion to exclude Defendants' expert.[2]

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ.

---

[1] Corresponding motions presenting the same arguments and relying on the same evidence were filed in the four related actions previously severed from the present action, C.A. Nos.: 3:05-2868-CMC; 3:05-3018-CMC; 3:05-3019-CMC; 3:05-3020-CMC .  The responses and replies are largely, if not entirely, the same in all actions.  The reasoning and analysis set forth in this order, therefore, applies with equal force in all five actions and is incorporated by contemporaneously filed docket text orders in those actions.

[2] Were the court to reach Plaintiffs' motion in limine, it would be inclined to reserve ruling until the time of trial.  This is because Plaintiff's arguments go primarily to the weight and scope of the testimony to be allowed.  They do not, on initial review, appear to support complete exclusion.

P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

### DISCUSSION

The court adopts the statement of facts as presented in Defendants' opening memorandum. The court further adopts the arguments expressed in Defendants' opening memorandum and reply except to the extent noted herein.

### 1.    Dismissal of Individual Plaintiff

The individually named Plaintiff, David Wayne Maddox ("Maddox"), is dismissed by agreement. Plaintiffs concede that the real plaintiff-in-interest is the corporate Plaintiff, Dawg Bone,

Inc. ("Dawg Bone").[3]  The remainder of this order, therefore, refers to the corporate Plaintiff in the singular.

### 2.     Statute of Limitations Defenses

For the reasons set forth below, the court  concludes that all causes of action fail on their merits as a matter of law.  It is, therefore, unnecessary to address the summary judgment motion to the extent it rests on a statute of limitations defense.  Nonetheless, in addressing the merits arguments, the court has assumed without deciding that no claim would be wholly time barred under any theory of relief.

### 3.     Evidentiary Basis of Claims

In support of its claims, Plaintiff filed an affidavit of the now-dismissed individual Plaintiff, Maddox, as well as affidavits of the individual plaintiffs from the related actions.  While these lengthy affidavits purport to speak to various matters in dispute, they are, ultimately, of very little assistance to Plaintiff's case for a variety of reasons.

First and foremost, many of the statements contained in the affidavits are clearly not based on first-hand knowledge.  For instance, all of the affidavits contain numerous statements introduced with phrases such as "it was said," "I was told," or "dealers were told," thus signaling a lack of first-hand knowledge.  *See, e.g.,* Affidavit of Joseph Spann ("Spann Affid.") ¶¶ 9, 15, 24 & 26 ("I am told"), ¶ 11 ("it was noted"), ¶ 13 ("I was told"), ¶ 18 ("it was said"), ¶ 19 ("The dealers were assured . . . I am told"), ¶ 23 ("it was found out" and information "came to light").  A number of other statements, by their content, make it doubtful that the affiant would have first hand knowledge.  *See, e.g.,* Spann Affid. ¶ 9 ("Soon thereafter, ConocoPhillips did sell its company-operated stores

---

[3]  Plaintiffs in the related actions have made similar concessions.

3

to Couche-Tard, a Canadian Company.").  In a number of instances, the apparently second-hand information is presented as a predicate or addition to a statement which may, itself, be based on personal knowledge. *See* Spann Affid. ¶ 3 ("when the FTC forced BP to divest"); ¶ 4 ("when Tosco was allowed by the FTC to take over the divested BP stations").  Thus, the admissible is mixed in with the inadmissible.

Many of the statements contained in the affidavits refer, generically, to the collective experience of "dealers."  While each of the affiants is a "dealer," the affidavits do not, in most instances, state that the affiant personally experienced the particular event at issue or otherwise explain the basis of the affiant's knowledge. *See, e.g.,* Spann Affid. ¶ 5 ("dealers met" and "[s]ome of the dealers wrote"), ¶¶ 8-9 (addressing effect of certain actions on dealers generally, but including one reference to "we," thus implying a direct experience), ¶¶ 10-13 (addressing effect of various actions on dealers generally without indicating effect on affiant's business); Affidavit of David Wayne Maddox ("Maddox Affid.") ¶ 5 (discussing concerns raised by and assurances given to unidentified dealers), ¶ 6 (stating Tosco ceased paying unidentified "dealers" for various categories of repairs and supplies, but using term "we" in regard to certain supplies), ¶ 10 (stating "dealers were assured by BP" without identifying the dealers so assured, although the attached letter suggests that Maddox was not one of the dealers who received the particular assurance[4]).  This form of presenting "facts" raises doubts as to whether the affiant is speaking from personal knowledge or merely repeating the claims of others with whom he shares certain interests.  These doubts are heightened

---

[4] This statement refers to an attached letter from BP Oil.  The attached letter is dated May 15, 1997, and addresses a six to ten cent per gallon "Dealer Price Support" which was effective June 1, 1997, and was in lieu of rent rebate provisions of the then-effective lease.  The letter is sent to a Donnel Carlton in Charlotte, North Carolina.

by the inclusion, as discussed above, of factual statements clearly not based on personal knowlege.

Numerous statements relating to representations made by others are also defective because of their generality.  For example, the affidavits generally fail to identify the speaker, time, and place of claimed representations.  *E.g.,* Maddox Affid. ¶ 5 ("The FTC assured the dealers that the dealers would be treated in the same manner as they had been with our arrangement with BP Oil."); ¶ 10 ("The dealers were assured by BP that we would have enough margins between the cost and the retail street prices of at least  .06 cents on regular fuel").[5]  The affidavits also fail to give the actual content of the representations, instead offering characterizations of the content of the only generally identified statements.

Further, with the exception of a few "I was told" statements, the affiants generally fail to identify even the specific person(s) to whom the representations were made, at most identifying groups of recipients such as "dealers."  The few instances in which the speaker is identified consist of characterizations of the testimony of a deponent, which is in the nature of argument, and is not the proper subject of an affidavit.  *See, e.g.,* Spann Affid. ¶¶ 24 &26 (identifying deponent but not providing a corresponding deposition citation); Maddox Affid.  ¶¶ 8 & 10-14 (citing deposition pages of three witnesses and offering conclusions drawn from their testimony).

In short, much of what is contained in the affidavits on which Plaintiff relies must be disregarded.  This is either because it is argument masquerading as statements of fact, or because it

---

[5]  The letter from BP Oil attached to Maddox's affidavit arguably cures any lack of specificity as to the assurances received from BP.  However, the letter also reveals that the assurance in question was given in 1997 to someone other than Maddox, and whose station was located in a different state.  Moreover, nothing in this letter suggests a particular length of time that the rebate program would remain in effect.

does not appear to be based on first hand knowledge.[6]  In many instances, multiple layers of hearsay are implicit in the way the statement is presented.  Moreover, most averments relating to representations are vague as to content, speaker, date, place and recipient.

Even if all statements of "fact" contained in the affidavits were considered, ignoring the implicit hearsay and other difficulties, Plaintiff's claims would fail for lack of the type of specific facts necessary to prove its claims.  *See infra* Sections 4-7.  Most critically, where detailed information is required to prove such matters as relative pricing and fairness of pricing, the affiants provide only conclusory or generalized statements.  For example, Maddox asserts: "The company operated stores were a leader of downward pricing in the Charleston market in 2003 . . . . On several occasions, the company operated stores were selling fuel near the cost the dealers had to pay ConocoPhillips."  Maddox Affid. ¶ 8 (citing Phillips' deposition).  Maddox also asserts: "ConocoPhillips was the leader in exerting downward pressure on the retail prices, while at the same time, setting high DTW prices on the dealers without any adequate relief."  Maddox Affid. ¶ 12 (citing Phillips' deposition.  *See also* Spann Affid. ¶ 15 ("The company operated stations were the leader of downward pricing in the Charleston [area] . . . and the affects [sic] were vastly felt in as much as the dealers could not match the company operated store prices.  On many occasions the company operated stores were selling fuel below the cost the dealers had to pay ConocoPhillips."), ¶ 20 ("The dealer tank wagon prices was [sic] so high such that the dealers could not sell

---

[6]  For instance, as noted above, there are a number of conclusions offered based on paraphrased statements from the depositions of others.  Other examples include Maddox and Spann's conclusion that Tosco had a strategy to price fuel unfairly based on their having "felt the affects [sic] of the strategy which was implemented by Tosco in its pricing of retail fuel at its company owned Circle K stores" *E.g.* Maddox Affid. ¶ 4; Spann Affid. ¶ 4.  Similarly, Spann offers as "fact" his conclusions as to Defendants' motives.  Spann Affid ¶ 17 ("It became clear after the fact that [Defendants] never intended to treat the dealers fairly.")

6

competitively in the marketplace.").  Such conclusory statements are not sufficient to support a judgment in Plaintiff's favor.

In addition to the other difficulties with the affidavits as discussed above, statements relating to assurances given to dealers by BP or the FTC appear to be irrelevant as neither BP nor the FTC are parties and no legal argument has been offered which would bind Defendants based on statements given by these separate entities.  *See* Maddox Affid. ¶¶ 5 & 10 (quoted *supra*).  Similarly, Maddox's speculation regarding the wisdom of the FTC in approving the BP-Amoco merger is irrelevant to any issue in this action.  Maddox Affid. ¶ 15 ("I believe the merger of BP and Amoco, which triggered the FTC to cause the selling of all the BP locations in North and South Carolina, resulted in harming the public, and accomplished nothing but disruption, confusion, and ill-will in the market place.").

Maddox and  the individual plaintiffs in the related actions, likewise, include allegations of wrongdoing not referenced in or suggested by their complaints.  *See, e.g.,* Maddox Affid. ¶ 16 (asserting that ConocoPhillips improperly failed to assign to Plaintiff its right of first refusal to purchase the real estate on which one of Dawg Bone's stations was located); Spann Affid. ¶ 10-12 (complaining that ConocoPhillips refused to replace equipment when it became irreparable, causing dealers to have to buy new equipment at their own expense, and that ConocoPhillips later reported the equipment as its own, using the value of that equipment to increase the price of the property when selling that property to the dealers who had, in fact, purchased the equipment).

When the various affidavits are stripped of what is clearly not based on personal knowledge, not a statement of fact, not relevant to any allegation or claim in the complaint, or not stated with sufficient detail to support a claim, Plaintiff is left with very little evidentiary support for any of the

7

individual elements of any of its claims.[7]  Taken together with other evidence (primarily the cited

deposition pages of Defendants' witnesses Victor Phillips and Wendell Cox), Plaintiff can, at most,

make out *some* elements of *some* claims, but not *all* elements of *any* claim.[8]

### 4.    Petroleum Marketing Practices Act Claim

Plaintiff's claim for violation of the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C.

§ 2801 *et seq.*, rests on allegations that Defendants engaged in improper pricing practices.  For

example, Plaintiff alleges that Defendants maintained a "pricing system" that was "discriminatory,

arbitrary and not uniform." Dawg Bone, Inc. Complaint ¶ 44.  Dawg Bone also alleges that

Defendants engaged in "predatory and discriminatory practices that adversely affect motor fuel

competition" and "unfair and deceptive trade practices within the meaning of the PMPA." *Id.* ¶¶ 45

& 52. While the latter two paragraphs might suggest concerns beyond pricing, the only specific

allegations relate to pricing.  Maddox Complaint ¶¶ 44, 46-51 & 53-57.[9]

The PMPA is not directed toward control of pricing.  Instead, it governs the nonrenewal or

termination of franchise relationships.  *See* 15 U.S.C. § 2802.  As explained by the Fourth Circuit

--------

[7]  Numerous depositions have been taken in this action, including depositions of Maddox and the individual plaintiffs in the related actions.  However, with very limited exceptions as to essentially undisputed matters (*e.g.,* the location of stations), Plaintiff has elected to rely solely on the affidavits of Maddox and the individual plaintiffs in the related actions.

[8]  As initially filed and with very few exceptions, Plaintiff's memorandum in opposition to the motion for summary judgment cited the various multi-page affidavits and extensive depositions without page, paragraph or line-specific references.  For example, the initial memorandum contained numerous citations to  "Cox depos. _____" or "Maddox affid.," giving neither a page nor paragraph reference.  Only after the court required more specific citations did Plaintiff provide page citations to either source.

[9]  The complaints in the related actions rest on similar allegations, although the precise wording and paragraph numbers may vary.

Court of Appeals:

> The Petroleum Marketing Practices Act (PMPA) governs the relationships between petroleum refiners and their retail franchisees. The PMPA's primary purpose is to protect petroleum franchisees from arbitrary or discriminatory terminations and nonrenewals. S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 874. This Act also serves two secondary purposes: to provide uniformity in the law governing petroleum franchise termination and nonrenewal, and to allow franchisors flexibility in dealing with franchisee misconduct or changes in market conditions. 1978 U.S.C.C.A.N. at 877. It expressly preempts state law governing termination or nonrenewal which differs from its provisions. 15 U.S.C.A § 2806(a).

*Mobil Oil Corp. v. Virginia Gasoline Marketers and Automotive Repair Ass'n, Inc.,* 34 F.3d 220, 223 (4th Cir. 1994). The PMPA has not been interpreted to govern more attenuated aspects of the franchisee-franchisor relationship. *See Palmieri v. Mobil Oil Co.* 682 F.2d 295 (2d Cir. 1982) (finding PMPA did not require franchisor to use objectively reasonable or economically realistic criteria in determining the amount of rent to charge franchisee, but only prohibited "franchisor from applying a rental formula in a discriminatory manner in order to drive a franchisee out of the franchise relationship").

Plaintiff argues that "[i]t is a misconception that the scope of the PMPA does not extend to improper pricing practices and [that] it applies only to the termination or non-renewal of franchises." Dkt No. 70-1 at 10-11. In support of this argument, Plaintiff cites generally to the operative provisions of the PMPA, 15 U.S.C. §2802, neither quoting nor directing the court to any specific language. The undersigned does not, however, find anything in the cited section which suggests inclusion of pricing practices within the scope of the PMPA. Moreover, *Mobil Oil* (quoted *supra*) suggests that the PMPA would not be interpreted so broadly by the Fourth Circuit Court of Appeals.

Plaintiff also cites to two federal cases addressing anti-trust laws and to a state law decision addressing the South Carolina Unfair Trade Practices Act. The two federal cases address distinct

statutory schemes within Title 15 of the United States Code. *See Perkins v. Standard Oil Co. of California,* 395 U.S. 642 (1969) (addressing Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) (addressing anti-trust laws including Section 4 of the Clayton Act, 15 U.S.C. § 15, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2). Nothing in these authorities suggests that the PMPA reaches price discrimination claims.

For the reasons set forth above and the further arguments presented by Defendants, the court concludes that Defendants are entitled to judgment as a matter of law on the PMPA claim because the allegations of improper pricing, even if otherwise factually supported, would not establish a violation of this Act. In addition, as discussed below, the court concludes that what pricing evidence is presented is insufficient as a matter of law to support any finding of unreasonable or unfair pricing or resulting damages to Plaintiffs.

The court declines to consider Plaintiff's additional allegations of wrongdoing relating to the non-assignment of a right of first refusal.[10] No such allegations were included in the complaint and it would be wasteful of judicial resources and unfair to Defendants to allow such a significant amendment after the close of discovery and full briefing on the motion for summary judgment.

### 5.    Damages

In his affidavit, Maddox claims that he was damaged as a result of Defendants' actions. He does not, however, offer specific testimony or other evidence from which causation and damages might be determined. *See, e.g.,* Maddox Affid. ¶ 10 (asserting that after the first post-merger year,

---

[10] In his affidavit, Maddox asserts that Defendant ConocoPhillips improperly failed to assign its right of first refusal to purchase the leased premises to Dawg Bone, when the third-party owner advised ConocoPhillips of its intent to sell.

"the wholesale cost of fuel never allowed the dealer to have a proper margin" but not addressing his alleged losses); ¶ 11 (stating that "dealer tank wagon [DTW] prices were so high that dealers could not sell competitively in the market place" but not suggesting specific losses); ¶ 13 (stating that because "dealers [did not] have adequate margins to be competitive, their inside sales suffered" and further stating that this was his personal experience but not providing information from which specific losses might be determined). This failure to present proper evidence of damages and causation defeats each of Plaintiff's claims.

**6.    Breach of Contract Claim**

Plaintiff has failed to offer evidence from which a jury could find that the pricing it was afforded was in violation of any term of its written agreement with Defendants ("Agreement"). To the extent Plaintiff may rely on an oral assurance, its claim is also defective for a variety of reasons addressed in Defendants' memoranda including: (1) no pre-contract oral agreement can vary the terms of the written Agreement in light of the integration clause; (2) there is no evidence of any post-contract oral assurance which was made to this Plaintiff or its agents which might arguably modify the terms of the Agreement; and (3) Plaintiff cannot rely on assurances given by third parties (including the FTC or BP), whether before or after the Agreement was entered.[11] In any case, there is no evidence of any breach of any pricing term of the Agreement including any implied term as discussed below (UCC claim).

---

[11] Plaintiff argues that "dealers" were told that they would be treated the same as they were by their prior franchisor, BP, in regard to payment of tank permits, maintenance, and repairs. Dkt No. 70 (Plaintiff memorandum citing Maddox Affid. p. 2 [¶ 5], Spann Affid. p. 2 [¶ 5]). The only relevant discussion in the cited affidavits refers to an assurance *given by the FTC* that the dealers "would be treated in the same manner as they had . . . with BP Oil." Maddox Affid. p. 2 ¶ 5; Spann Affid. p. 2 ¶ 5. *See also* Maddox Affid. ¶ 10 (discussing assurances from BP as represented in 1997 letter to a third party). The court finds no specific reference to any assurances *given by Defendants* of any term different from what was set forth in Plaintiff's Agreement.

### 7.    UCC Claim

Plaintiff claims that it was charged a commercially unreasonable price in violation of the UCC as adopted in South Carolina.[12]  The evidence offered in support of this claim consists of conclusory statements such as that Defendants were leaders in exerting downward pressure on the price of gasoline while setting high prices on wholesale fuel sold to dealers or generic statements such as that the retail prices at Defendants' company-owned locations were sometimes very near the wholesale prices charged independent dealers.  *E.g. Maddox Affid.* ¶¶ 8 & 12 (quoted *supra*). Specific prices, dates, degree of difference and frequency of the problem are not provided.  Neither does Plaintiff offer any evidence from which a jury might determine if such occasional events warranted a finding that the prices were "unreasonable."  In any event, facts relating to "dealers" generally would not support a finding in favor of this specific dealer.  In short, what evidence is offered is not enough to support a finding in Plaintiff's favor that the prices set were unreasonable under the UCC.

### 8.    Robinson-Patman Act

For much the same reasons as addressed above as to the UCC claim, and for reasons further argued by Defendants, the court concludes that Defendant is entitled to judgment as a matter of law on the Robinson-Patman Act claim.

### 9.    South Carolina Unfair Trade Practices Act

Although the specific elements differ, Plaintiff's claim for violation of the South Carolina Unfair Trade Practices Act fails for essentially the same reasons as discussed above as to the UCC

---

[12] The case law cited in this section of Plaintiff's brief relates to federal price discrimination claims, not state law UCC claims.

claim. There is simply no prediction of evidence from which a jury could find that Defendants' pricing practices were unfair or deceptive or that those practices had an impact on the public interest.

**10.     Motion to Exclude Defendants' Expert**

Given the failure of Plaintiff's evidence, the court need not consider the evidence offered by Defendants' expert. The court has, therefore, resolved the motion for summary judgment without consideration of the proffered testimony of Defendant's expert. Plaintiff's motion to exclude this expert is, therefore, moot.

**CONCLUSION**

For the reasons set forth above, the court dismisses the individual Plaintiff, David Wayne Maddox, as not the real party in interest. This dismissal is with prejudice. The court also grants Defendants' motion for summary judgment in full, albeit not on all grounds asserted. The Clerk of Court is, therefore, directed to dismiss the individual Plaintiff, David Wayne Maddox, with prejudice and to enter judgment in Defendants' favor on all claims asserted by the corporate Plaintiff Dawg Bone, Inc.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
June 22, 2006

13